UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH THOMPSON #604059,

    Plaintiff,                            Hon. Paul L. Maloney

v.                                              Case No. 1:21-cv-683

HEIDI WASHINGTON, et al.,

    Defendants.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff Kenneth Thompson, a state prisoner who is currently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison, filed his complaint in this action on August 10, 2021, pursuant to 42 U.S.C. § 1983, against several MDOC employees and officials based on events that occurred from April 2019 through March 2021 at the Ionia Correctional Facility (ICF). Plaintiff's remaining claims are his: (1) Eighth Amendment claims regarding his placement in segregation and the conditions therein for (a) declaratory and injunctive relief against Defendants Washington and Dawdy in their official capacities, and (b) monetary damages against Defendants Washington, Dawdy, Maranka, Sandborn, and Barber in their individual capacities; and (2) Plaintiff's official capacity Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) claims against Defendant Washington.

Presently before me is Defendants' Motion for Summary Judgment (ECF No. 37) and Plaintiff's Motion to Stay Summary Judgment (ECF No. 40), both of which are fully briefed and ready for decision. Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that Defendants' motion be **GRANTED,** and that Plaintiff's motion be **DENIED**.

### I. Background

Plaintiff alleges that he suffers from serious mental disabilities and has an MDOC diagnosis of major depression with psychotic features and a mood disorder. He experiences symptoms such as depression, anxiety, paranoia, and hallucinations. His mental disability "results in a substantial disorder of thought and impaired judgment, behavior, problems concentrating, making decisions, difficulty sleeping, all of which affect [his] daily activities." Plaintiff has been prescribed Zoloft and Geodon. (ECF No. 1 at PageID.4.)

Plaintiff alleges that Defendants have "either failed or interfered with providing Plaintiff appropriate mental health treatment, and subject him to disciplinary treatment in lieu of providing that treatment." (*Id.*) He further alleges that Defendants have "an illegal practice of punishing mentally disabled prisoners for behavior or symptoms known to be related to mental illness, despite the prohibition on such punishment set forth in MDOC Policy Directive 03.03.105." (*Id.* at PageID.5.) Plaintiff avers that Defendants Washington and Dawdy have implemented inadequate screening policies and procedures regarding mentally disabled prisoners and the misconduct process. (*Id.* at PageID.5–6.) He alleges that these inadequate policies have caused MDOC officials to issue him "misconduct reports and guilty findings, as pretext to discrimination against him by virtue of his mental disability." (*Id.* at PageID.6.)

The Court has previously found that Plaintiff sufficiently stated an Eighth Amendment claim based on his allegation that his placement in segregation and the conditions to which he was subjected had a particularly deleterious impact on him and exacerbated his mental illness symptoms. (ECF No. 8 at PageID.49.)

### A. MDOC Mental Health Policies

The MDOC has enacted several policies that are relevant to Plaintiff's claim. First, Policy Directive 03.03.105, which addresses prisoner discipline, sets forth the rules and procedure for issuing misconduct reports for violations of prison rules and imposing discipline for such violations. MDOC Policy Directive 03.03.105 (effective July 1, 2018). This Policy Directive contains "Special Provisions for Prisoners with a Mental Disability." The policy provides that:

> A prisoner with a mental disability is not responsible for misconduct if s/he lacks substantial capacity to know the wrongfulness of his/her conduct or is unable to conform his/her conduct to Department rules as a result of the mental disability. "Mental disability" is defined as any of the following:
>
> 1. Mental illness, which is a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or the ability to cope with the ordinary demands of life.
>
> 2. Severe chronic brain disorder, which is characterized by multiple cognitive defects (e.g., memory impairment resulting from a medical condition or brain injury due to trauma or toxins).
>
> 3. Developmental disorder, which usually manifests before the age of 18 years and is characterized by severe and pervasive impairment in several areas of development (e.g., autism; retardation).

*Id.* ¶ DDD. If a prisoner, a hearing investigator, or a hearing officer raises the issue of whether the prisoner's conduct underlying the misconduct was due to a mental disability, a request for responsibility determination will be submitted to an appropriate mental health official. *Id.* ¶ EEE. Whenever a Class I or Class II misconduct ticket is issued to a prisoner who is receiving mental health services, the Unit Chief or QMHP (qualified mental health provider) "shall determine prior to the hearing whether the prisoner is not responsible for his/her behavior due to his/her mental disability. This information shall be provided prior to any review with or notice to the prisoner." *Id.* ¶ GGG.

3

Second, Policy Directive 04.06.182 pertains to placement of mentally disabled prisoners in segregation. MDOC Policy Directive 04.06.182 (effective Dec. 29, 2010). The policy provides:

> Prisoners with a mental disability ordinarily should not be housed in segregation if the disability may preclude adequate adjustment in segregation. The Department has more appropriate mental health care settings which are designed for the therapeutic management and care of these prisoners; for example, inpatient psychiatric hospitalization, Residential Treatment Programs (RTPs) including the Adaptive Skills Residential Program (ASRP), and the Secure Status Outpatient Treatment Program (SSOTP). Some prisoners with mental disabilities, however, cannot be managed outside of a segregation unit without presenting a serious threat to their own safety or the safety of staff or other prisoners. While in segregation, such prisoners must be closely followed by the institution Outpatient Mental Health Team (OPMHT) or a QMHP to ensure their mental health needs are continuing to be met.

*Id.* ¶ D. The policy also specifies a procedure for determining whether a prisoner with a mental disability who has been placed in segregation should be moved to an alternative placement or continued in segregation to ensure the safety of staff and other prisoners. *Id.* ¶¶ G–M.

Finally, Policy Directive 04.05.120 provides general segregation standards, including personal property, program and activity access, and exercise opportunities that a prisoner confined to segregation may possess or receive. MDOC Policy Directive 04.05.120 (effective Sept. 27, 2010 and June 1, 2019).[1] This policy directive also addresses provision of mental health services to prisoners with a mental health condition who are confined to segregation. *Id.* ¶¶ XX–AAA.

### B. Plaintiff's Misconducts

Relevant to Plaintiff's allegations, Plaintiff was incarcerated at ICF from June 19, 2018, to May 5, 2022. (ECF No. 38-2.) During this time, he received three major misconduct tickets for

---

[1] Two different versions of Policy Directive 04.05.120 were in effect during the events giving rise to Plaintiff's claims.

violations that occurred on April 6, 2019, March 6, 2020, and February 18, 2021.[2] (ECF No. 1 at PageID.6–8.) On April 6, 2019, Plaintiff received a misconduct for assault and battery (prisoner victim) and possession of a weapon. (ECF No. 38-3.) On April 9, 2019, a non-defendant mental health provider completed a form CSJ-331 determining that Plaintiff's mental disability/limitations had no effect on the conduct alleged in the misconduct report. The mental health provider recommended loss of privileges and indicated that long-term segregation may increase Plaintiff's mental health symptoms. (ECF No. 38-7.) Plaintiff was found guilty of the violation on April 10, 2019 and received 20 days of detention and 80 days loss of privileges. (ECF No. 38-2.)

On March 6, 2020, Plaintiff was issued a misconduct for threatening behavior. (ECF No. 38-4.) On March 9, 2020, Defendant Maranka completed a form CSJ-331 determining that Plaintiff's mental disability/limitations had no effect on the conduct alleged in the misconduct report. Defendant Maranka recommended loss of privileges and indicated that long-term segregation may increase Plaintiff's mental health symptoms.[3] (ECF No. 46-13.) Plaintiff was found guilty of the violation on March 16, 2020 and received 10 days of detention and 30 days loss of privileges. (ECF No. 38-4)

On February 18, 2021, Plaintiff was issued a misconduct for fighting and possession of a weapon. (ECF No. 38-5.) On February 19, 2021, Defendant Maranka completed a form CSJ-331 determining that Plaintiff's mental disability/limitations had no effect on the conduct alleged in

---

[2] In addition to the misconducts that Plaintiff identifies in his complaint, Plaintiff also submitted a misconduct hearing report for a violation that occurred on February 24, 2020. He was given five days of detention and 30 days loss of privileges for the violation. (ECF No. 46-2 at PageID.472.)

[3] Although Defendants failed to attach the March 9, 2020 form CSJ-331 as an exhibit to their brief, Plaintiff attached it to his declaration in response to Defendants' motion.

the misconduct report. Defendant Maranka recommended loss of privileges and indicated that long-term segregation may increase Plaintiff's mental health symptoms. (ECF No. 38-6.) Plaintiff was found guilty of the violation on April 14, 2021 and received 20 days of detention and 60 days loss of privileges. (ECF No. 38-5.)

## II. Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Discussion

### A. Plaintiff's Rule 56(d) Motion to Stay Summary Judgment

Plaintiff responded to Defendants' motion with a motion to stay a ruling on Defendants' motion until Plaintiff is able to obtain certain discovery from Defendants. (ECF No. 41.) Plaintiff also filed a declaration setting forth the discovery he claims he needs in order to respond to Defendants' motion. (ECF No. 39.)

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery."

Fed. R. Civ. P. 56(d)(2). The Sixth Circuit has observed that "the plaintiff must receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Short v. Oaks Corr. Facility*, 129 F. App'x 278, 281 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 257). Therefore, "[a] grant of summary judgment is improper if the non-movant is given an insufficient opportunity for discovery." *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231–32 (6th Cir. 1994). In deciding a Rule 56(d) motion, a court should weigh the following factors:

> (1) when the [affiant] learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling [on summary judgment]; (3) how long the discovery period had lasted; (4) whether the [affiant] was dilatory in its discovery efforts; and (5) whether the [party moving for summary judgment] was responsive to discovery requests.

*Doe v. City of Memphis*, 928 F.3d 481, 491 (6th Cir. 2019) (quoting *Plott v. General Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995)). As the Sixth Circuit observed in *Doe*, the "main inquiry is 'whether the moving party was diligent in pursuing discovery.'" *Doe*, 928 F.3d at 491-92 (quoting *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014)).

As noted above, Plaintiff filed his complaint on August 10, 2021, and on June 14, 2022, following its initial review, the Court allowed Plaintiff's Eighth Amendment claims regarding his placement in segregation and the conditions therein and his ADA and RA claims to proceed. (ECF Nos. 1, 8 and 9.) The case was stayed in the Prisoner Early Mediation Program (PEM) from June 16, 2022 until May 1, 2023, when it was removed from PEM following an unsuccessful mediation session. (ECF Nos. 10 and 15.) On July 10, 2023, I entered a Standard Case Management Order in a Prisoner Civil Rights Case (CMO), which directed that all discovery "be completed by November 7, 2023." (ECF No. 26 at PageID.99.) Plaintiff did not serve discovery requests on Defendants until October 30, 2023. (ECF No. 35.) On November 22, 2023, Defendants objected to all of Plaintiff's discovery requests because discovery could not be completed by November 7,

7

2023. (ECF Nos. 36, 44-2—44-11.) *See McNeal v. Hargett*, No. 1:20-cv-596, 2023 WL 4311397, at *2 (W.D. Mich. July 3, 2023) (citing *Drahuse v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-14117, 2011 WL 4088170, at *2 (E.D. Mich. Sept. 14, 2011) (collecting cases) ("Federal courts have found that discovery must be served upon a party so that the receiving party has enough time to respond, as provided for in the Federal Rules, otherwise, the discovery requests are untimely.")). Plaintiff's requests for production to all Defendants sought the same documents: (1) Plaintiff's medical records from the time of his incarceration at ICF though the date of the response: (2) any and all MDOC rules, regulations, and policies regarding treatment and handling of prisoners with mental disabilities; (3) all documents showing how often Plaintiff was seen by mental health providers while he was in segregation; (4) all documents showing that long-term segregation did not deteriorate Plaintiff's mental health; and (5) all other documents relating to Plaintiff's allegations in his complaint. (ECF No. 44-11.)

Plaintiff fails to demonstrate diligence during the four-month discovery period. While it is true, as Plaintiff notes, that he was transferred three times during the discovery period, he still had ample time to propound his discovery requests to Defendants while leaving them sufficient time to provide their answers. For example, Plaintiff had at least one month between issuance of the CMO and his first transfer and at least another month between his first and second transfers in which to formulate his discovery requests and serve them on Defendants. Moreover, Plaintiff's assertion that his property was lost each time each time he was transferred, hindering his ability "to properly prepare and access the courts and the law library to research [his] case" (ECF No. 39 at PageID.345), rings hollow because Plaintiff had more than a year prior to issuance of the CMO while the case remained in PEM to research his case and determine what discovery he would need from Defendants in the event mediation failed.

Turning to the *Plott* factors, factors 1, 3, 4, and 5 weigh against Plaintiff's request. First, Plaintiff should have known of the need for discovery at least as early as the date the CMO was issued. The documents he now claims he needs—his mental health records, security classification notices, segregation behavior reviews, offender network management information, and START NOW mental health program manual (*Id.* at PageID.346)—should have been obvious to him even before the CMO issued; he, of course, is aware of what his claims entail. In addition, although the discovery period lasted only four months, with interruptions from transfers, Plaintiff was not diligent for the reasons already discussed. While Defendants did not provide substantive responses, they properly objected because Plaintiff's untimely requests left them with insufficient time to respond before the end of the discovery period. As for the second factor, the information Plaintiff seeks would not change the outcome of Defendants' summary judgment motion based on qualified immunity.

Finally, Plaintiff says that he needs an affidavit from prisoner Jonathan Jones to support his claim that he was treated differently because of his mental disability. (*Id.*) However, prisoner Jones' affidavit is immaterial to this action because prisoner Jones could not be a proper comparator in support of Plaintiff's ADA/RA claim. That is, because Plaintiff asserts that prisoner Jones has also been diagnosed with a major mental disability but was treated differently than Plaintiff, prisoner Jones is not outside the protected class and thus would not be a proper comparator to the extent Plaintiff seeks to prove discrimination by proof that similarly situated prisoners outside of the protected class were treated differently. *See Morris v. Starwood Hotels & Resorts Worldwide, Inc.*, 2:13-cv-588, 2015 WL 4744536, at *5 (N.D. Ala. Aug. 11, 2015) (stating that "Lane cannot be a proper comparator for the disability discrimination claim because she is also disabled, . . . , and thus not outside Morris' protected class for purposes of the ADA claim");

9

*Herrera v. Illinois Bell Tel. Co.*, No. 11 C 5762, 2013 WL 654920, at \*15 (N.D. Ill. Feb. 21, 2013) ("[E]ven if Herrera were to prove Maria Galvez (one of her alleged comparators) was a similarly situated employee who was not terminated despite a history poor performance, the disparate treatment would be useless (even harmful) to Herrera's claim if Galvez was also disabled or took FMLA leave."). Thus, I recommend that the Court deny Plaintiff's motion.

### B. Defendants' Motion

#### 1. Eighth Amendment Claims

Defendants move for qualified immunity on Plaintiff's individual capacity Eighth Amendment claims. [4] "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant violated a right so clearly established "that every 'reasonable official would [have understood] that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Second, the court asks if the right at issue was "'clearly established'

---

[4] In their opening brief, Defendants also moved for summary judgment based on Plaintiff's failure to exhaust his administrative remedies. (ECF No. 38 at PageID.130–36.) With their reply, Defendants concede that Plaintiff "did exhaust his administrative remedies under the PLRA." (ECF No. 49 at PageID.587.) Accordingly, Defendants' affirmative defense of failure to exhaust should be deemed abandoned.

when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

### a. Constitutional Violation

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). Consequently, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

For a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010)

11

(citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Beginning with Defendants Washington and Dawdy, Plaintiff's claim is that they have implemented inadequate policies and procedures "to ensure that seriously mentally disabled prisoners are not subject to the misconduct process for behavior or symptoms related to their mental disability." (ECF No. at PageID.6.) Contrary to this allegation, however, the policies set forth above do recognize a procedure and safeguards for ensuring that mentally disabled prisoners are not punished for behavior that occurs due to a mental disability. Plaintiff contends that, in practice, the procedures are not followed because MDOC hearing investigators sign and date the screening form (CJS-330, *see* ECF No. 46-6) but do not complete the screening questions, the answers to which would show whether the prisoner is exhibiting impaired judgment or behavior at the time of the misconduct. (ECF No. 45 at PageID.447–48; ECF No. 46 at PageID.459.)

12

Plaintiff further asserts that the screening form is then forwarded to a mental health official for completion of a responsibility determination, but pursuant to a "wide spread practice," the mental health officials do not meet with or evaluate prisoners before making the responsibility determinations. (ECF No. 45 at PageID.448; ECF No. 46 at PageID.460.) Plaintiff asserts that this shows that Defendants Washington and Dawdy have failed to implement proper screening procedures for mentally-disabled prisoners. (*Id.*)

First, to the extent Plaintiff asserts that prison officials' failure to follow the screening process set forth in Policy Directive 03.03.105 violates the Eighth Amendment, his argument fails because a violation of a prison policy is not a basis for a Section 1983 claim. *See Smith v. Davids*, No. 1:19-cv-402, 2021 WL 4451951, at *3 (W.D. Mich. Sept. 29, 2021) (citing, among others, *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001)). Moreover, Plaintiff ignores that, even if the hearing investigator fails to answer the screening questions, the form dictates that the hearing investigator must refer the case to a QMHP if the prisoner answers "yes" to certain questions (ECF No. 46-6), which is exactly what occurred in each instance in which Plaintiff received a misconduct. In addition, the policy does not specifically provide that the QMHP must personally interview or examine the prisoner to make the responsibility determination. In any event, Plaintiff fails to demonstrate that the foregoing policies violate the Eighth Amendment or that Defendants have failed to adopt policies ensuring that his "basic needs and requirements" were met while he was detained in segregation. *Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011).

As for Defendants Maranka, Sandborn, and Barber, Plaintiff fails to show that their conduct in compliance with MDOC policies and associated decisions resulting in Plaintiff's placement in segregation violated his Eighth Amendment rights. First, pursuant to Policy Directive 03.03.105, Defendant Maranka determined that Plaintiff's mental disability did not affect his behavior

underlying the misconducts at issue. While Plaintiff disagrees with Defendant Maranka's determinations, he fails to demonstrate how Defendant Maranka's actions deprived him of basic human needs while in segregation. Similarly, while Plaintiff alleges that Defendants Sandborn and Barber unlawfully subjected him to segregation, it is undisputed that, in each instance, placement in segregation was warranted because a hearing officer found Plaintiff guilty of the misconduct. Again, as with Defendant Maranka, Plaintiff fails to present evidence showing that Defendants Sandborn and Barber denied him his basic human needs. Finally, Plaintiff fails to present evidence establishing deliberate indifference by any Defendant.

### b. Clearly Established Law

The clearly established prong focuses on the state of the law at the time the alleged violation occurred. "The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)). As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). It is not enough to show that the right is established at "'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft*, 563 U.S. at 742). "[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* at 993 (quoting *White*, 580 U.S. at 79). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019). "An official's conduct flunks this 'clearly established' test only if the conduct's unconstitutionality was 'beyond debate' when the official acted, such that any reasonable person would have known

that it exceeded constitutional bounds." *DeCrane v. Eckart*, 12 F.4th 586, 599 (6th Cir. 2021). To determine whether a right is clearly established, a district court within the Sixth Circuit may consider binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point. *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Risbridger v. Connelly*, 275 F.3 565, 569 (6th Cir. 2002)).

Plaintiff fails to meet his burden of showing that Defendants violated clearly established law. Plaintiff fails to cite any case that would have clearly established that the MDOC policies cited above were unconstitutional. In other words, Plaintiff fails to show that Defendants Washington and Dawdy had fair warning that the policies they enacted violated the Eighth Amendment. Similarly, Plaintiff fails to cite any case by which Defendants Maranka, Sanborn, and Barber would have known that their actions violated clearly established law. In other words, it was not "beyond debate" that their actions were unconstitutional. *DeCrane*, 12 F.4th at 599.

### 2. ADA and RA Claims

Defendants contend that the Court should dismiss Plaintiff's ADA and RA claims against Defendant Washington because Plaintiff fails to establish an underlying Eighth Amendment claim that could serve as a basis to abrogate the MDOC's sovereign immunity. Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."[5] 42 U.S.C. § 12132. The ADA applies to both federal and state prisons. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998). The ADA "validly abrogates state sovereign immunity" for "conduct that *actually* violates the

---

[5] Courts typically analyze claims under Title II of the ADA and the RA together. *See Thompson v. Williamson Co.*, 219 F.3d 555, 557, n. 3 (6th Cir.2000) ("Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act . . . claims brought under both statutes may be analyzed together.").

Fourteenth Amendment[.]" *United States v. Georgia*, 546 U.S. 151, 159 (2006); *see also Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010). In *United States v. Georgia*, the Court held that in authorizing damage suits against States as a remedy for violation of Title II, Congress abrogated their sovereign immunity only to the extent that violations at issue also implicate substantive constitutional rights. The Court held that because the plaintiff alleged an Eighth Amendment violation based on conduct that also violated Title II of the ADA, his allegations sufficed to abrogate Georgia's sovereign immunity. 546 U.S. at 157. The Court further specified a three-part test to assist district courts in determining whether Congress has abrogated Eleventh Amendment immunity to a claim under Title II. A court must "[d]etermine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 159. The Sixth Circuit requires courts to apply this test when analyzing whether a State has sovereign immunity in Title II cases. *See Mingus*, 591 F.3d at 482.

Applying the above three-part test, I conclude that the MDOC's Eleventh Amendment immunity is not abrogated in this situation. Here, Plaintiff's ADA claim is coextensive with his Eighth Amendment claim. That is, Plaintiff alleges that he was subjected to disciplinary treatment when he should have been provided mental health treatment instead and that such denial violated both the Eighth Amendment and Title II of the ADA. (ECF No. 1 at PageID.4; ECF 45 at PageID.453.) Because Plaintiff's claims are premised on the same conduct, and Plaintiff fails to demonstrate an Eighth Amendment violation, Defendant Washington is entitled to Eleventh Amendment immunity on Plaintiff's official capacity ADA claim. *See Redding v. Georgia*, 557 F.

App'x 840, 845 (11th Cir. 2014) (concluding that the Eleventh Amendment precluded the plaintiff's ADA claim given that his Eighth Amendment conditions-of-confinement claim failed to state a claim).

Plaintiff's RA claim is not subject to the foregoing analysis. Because the MDOC receives federal funds, is not entitled to Eleventh Amendment immunity under the RA. *See Stevens v. Michigan Dep't of Corrs.*, No. 1:17-cv-495, 2020 WL 4435062, at *1 (W.D. Mich. Aug. 3, 2020) (holding that the MDOC waived its Eleventh Amendment immunity to claims under the RA because it accepted federal funds, even if the food service did not specifically receive federal funds); *Douglas v. Muzzin*, No. 1:15-cv-41, 2017 WL 4310773, at *5 (W.D. Mich. Sept. 28, 2017) (noting that "MDOC employees sued under the RA in their official capacities typically concede that the MDOC receives federal funds"). Nonetheless, even though the Eleventh Amendment does not bar Plaintiff's RA claim, both his ADA and RA claims fail because Plaintiff's allegations essentially boil down to a claim that he was denied mental health care, which courts have found does not establish a violation of either the ADA or the RA. *See Brown v. Ohio*, No. 1:17-cv-764, 2018 WL 798881, at *4 (S.D. Ohio Jan. 5, 2018), *report and recommendation adopted*, 2018 WL 776268 (S.D. Ohio Feb. 8, 2018) ("Plaintiff's allegation that he was wrongly denied mental health treatment does not provide a basis for relief under the ADA.") (citing *Watson v. Mohr*, 2:17-cv-457, 2017 WL 6383812, at *5 (S.D. Ohio Dec. 14, 2017), *report and recommendation adopted*, 2018 WL 836484 (S.D. Ohio Feb. 13, 2018) (concluding that the plaintiff's ADA claim was "an Eighth Amendment deliberate indifference claim in another statutory guise")). As the Ninth Circuit observed in *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc), "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." Thus, "the

Act would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. . . . The ADA does not create a remedy for medical malpractice."). *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). This is because a Title II plaintiff must present evidence showing exclusion from services or programs because of his disability. *See Welsh v. Grandville Pub. Schs.*, No. 1:20-cv-1207, 2022 WL 708692, at *8–9 (W.D. Mich. Jan. 28, 2022), *report and recommendation adopted*, 2022 WL 593586 (W.D. Mich. Feb. 28, 2022). Here, Plaintiff was put in disciplinary segregation rather than an alternative mental health placement precisely because QMHPs determined that Plaintiff's mental disability played no part in his conduct leading to the misconducts. Therefore, Plaintiff fails to establish his ADA and RA claims.

## IV. Conclusion

For the reasons set forth above, I recommend that the Court **deny** Plaintiff's motion to stay summary judgment (ECF No. 40), **grant** Defendants' motion for summary judgment (ECF No. 37) and dismiss Plaintiff's complaint with prejudice.

Dated: April 4, 2024                                                  /s/ Sally J. Berens
                                                                      SALLY J. BERENS
                                                                      U.S. Magistrate Judge

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).